UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| CHERYL EVANS, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| VS. ) | CAUSE NO. 2:12-CV-466-RLM-APR |
| ) | |
| U.S. DEPARTMENT OF THE ) | |
| INTERIOR AND NATIONAL PARK ) | |
| SERVICE, ) | |
| ) | |
| DEFENDANTS. ) | |

OPINION and ORDER

Cheryl Evans brings this suit against the National Park Service and the
U.S. Department of the Interior, alleging that these agencies (collectively, "the
government") violated the Freedom of Information Act by refusing to release or
releasing in redacted form documents in response to six of her FOIA requests.
The court's jurisdiction over a FOIA suit arises under 5 U.S.C. § 552(a)(4)(B),
which requires the court to "determine the matter de novo" and puts "the
burden . . . on the agency to sustain its action." If the agency has unlawfully
withheld records, the court can enjoin the agency from withholding them and
order their production. *See id.*

I. FACTS

The essential facts of this case aren't in dispute.[1]

---

[1] Ms. Evans's Statement of Genuine Disputes asks the court to strike Paragraphs 7-8,
12, and 16-19 of the government's Statement of Material Facts. She disputes these statements

In 2012 and 2013, Ms. Evans, a licensed attorney representing herself in this case, made a series of FOIA requests to the Park Service seeking documents relating to the Indiana Dunes National Lakeshore ("Lakeshore"). Ms. Evans asked for documents about the extent to which the Park Service has law enforcement authority and/or jurisdiction within specific areas of the Lakeshore. Because much of the parties' dispute concerns timing as it relates to requests, responses, and appeals, the court reviews the timeline of Ms. Evans's six FOIA requests in some detail.

*Request 12-360:*

Ms. Evans made her first request on February 25, 2012. This request sought three specific categories of records:

1. Indiana Dunes National Lakeshore, Standard Operating Procedure #2420, Traffic Enforcement – Jurisdiction of Roadways (Updated 02-01-2006).

2. Indiana Dunes National Lakeshore Law Enforcement General Agreement with Porter County.

---

of fact not because they conflict with other evidence in the record, but because they cite for support Ms. Evans's own Statement of Material Facts attached to her previous summary judgment motion. The court never had occasion to rule on Ms. Evans's summary judgment motion because she amended her complaint, making that motion moot. Ms. Evans now insists that because her summary judgment pleadings related to her original complaint, and her amended complaint replaced her original complaint, the government is supporting its factual contentions with citations to a complaint that "no longer exists." She asks the court to strike these paragraphs from the government's Statement of Material Facts on this basis. The court declines to do so. The facts these paragraphs relate are straightforward, uncontroverted statements about the dates of Ms. Evans's FOIA requests, the identification numbers assigned to each request by the Park Service, and the dates of agency responses. Even if the government was careless in citing to a mooted pleading in support of these facts, the declarations and documentary evidence in the record – along with Ms. Evans's amended complaint, which lists *precisely* the same dates and identification numbers – provide ample support for the challenged statements independent of Ms. Evans's mooted summary judgment pleadings. As Ms. Evans has never identified any record evidence suggesting that the dates and numbers of her FOIA requests differ from what the government alleges, these facts are not actually disputed and the court declines Ms. Evans's request to strike the challenged paragraphs.

3. Two records written by the Park Service in October 1977 and May 1994 which requested concurrent jurisdiction over Indiana Dunes National Lakeshore and Indiana Dunes State Park, as well as two records written by the State of Indiana in May 1978 and August 1994 which conferred such jurisdiction by the State over those two properties; including any supporting documents the State included with the documents that conferred this authority.

This request was assigned the tracking number NPS-2012-00360 ("request 12-360"). The Park Service acknowledged receipt of this request on March 6, 2002, and responded on April 5, 2012 with a letter informing Ms. Evans that the agency had found five documents responsive to the request. The agency produced four of the documents immediately but indicated it was still reviewing whether to release the requested Traffic Enforcement Standard Operating Procedure ("Traffic SOP"). On April 20, 2012, the Park Service sent Ms. Evans a letter advising her that it would only release the Traffic SOP in a heavily redacted form, based on FOIA Exemption 7(E). The version of the Traffic SOP initially released to Ms. Evans contained unredacted sections stating the "Purpose," "Definitions," and "Scope" of the Traffic SOP, but the final four pages of the document under the section "Procedure" were blacked out completely. This letter informed Ms. Evans of her appeal rights and how to exercise them, noting that she would have to appeal (if at all) within 30 days of the agency's response.

Ms. Evans appealed the partial denial of request 12-360 – specifically, the redactions to the Traffic SOP – on May 21, 2012. The appeal letter contended that the Park Service hadn't adequately demonstrated that Exemption 7(E) covered the information that was withheld. It also argued that the agency hadn't segregated exempted material from what could be disclosed, because the

redactions to the Traffic SOP were overly broad. The Department of the Interior (acting on behalf of the Park Service) responded to Ms. Evans's appeal by letter on June 26, 2012. This letter told Ms. Evans that the agency couldn't make a determination on her appeal within the 20 working days required by statute, so Ms. Evans had the right to seek judicial review.

*Request 12-513*

On April 6, 2012 (the day after the Park Service's initial response to request 12-360), Ms. Evans sent the Park Service two emails asserting that the agency's response to request 12-360 was deficient. Ms. Evans complained that while the Park Service had turned over three of the four requested letters between Indiana and the Lakeshore, it hadn't produced the final letter or produced four attachments originally included with those letters. The Park Service treated these emails as a new FOIA request, acknowledged the request in a letter dated April 17, 2012, and assigned it the tracking number NPS-2012-00513 ("request 12-513").

The Park Service issued a final response to request 12-513 on August 2, 2012, providing Ms. Evans with the requested letter and one of the four requested attachments. The agency stated that park staff had searched for the remaining three attachments but couldn't find them. This letter advised Ms. Evans about her appeal rights and how to appeal the agency's determination. Ms. Evans never administratively appealed the response to request 12-513.

Ms. Evans made another email FOIA request to the Park Service on April 13, 2012, asking for:

> 1. Any documents or electronic records in which the Lakeshore and either the field solicitor, U.S. Attorney's Office, or another federal agency discussed enforcement authority issues or discussed clarification of the extent of National Park Service jurisdiction relative to the Lakeshore – particularly any correspondence in which authority was concurred with or denied.

> 2. Any correspondence between the Lakeshore and the Town of Porter concerning buoys in Lake Michigan – particularly those records in which the Lakeshore discussed removing those buoys.

> 3. Any correspondence between the Lakeshore and the State of Indiana or one of its agencies concerning buoys in Lake Michigan – particularly those records in which the Lakeshore discussed removing those buoys from Porter Beach.

> 4. Any correspondence between the Lakeshore and the Coast Guard concerning swimming buoys in Lake Michigan at Porter Beach – particularly those records in which the Lakeshore discussed removing those buoys from Porter Beach.

> 5. Any correspondence between the Lakeshore and the State of Indiana or one of its agencies concerning the operation of jet skis on Lake Michigan.

The Park Service acknowledged receipt of this request on April 17, 2012, assigned it number NPS-2012-00514 ("request 12-514"), and told Ms. Evans that processing of the request would begin after the Park Service received an advance processing fee.

The Park Service provided Ms. Evans with 27 documents in response to request 12-514 on August 28, 2012. The letter also said that fifteen additional responsive documents were being withheld pending consultation with the Department of the Interior Solicitor's Office, and informed Ms. Evans of her right

to appeal and the procedures necessary to do so. The Park Service sent a "final response" to Ms. Evans on September 27, 2012 releasing in full one of the fifteen documents under consideration, releasing one other in redacted form, and withholding the remaining thirteen documents entirely. This letter told Ms. Evans about her appeal rights and how to exercise them, and included an index listing the withheld documents and the exemptions the Park Service asserted applied to them.

On July 3, 2013 (after this litigation began), the Park Service informed Ms. Evans by email that the agency had reconsidered two of the originally withheld documents and now believed that they were public records to which Ms. Evans was entitled. Attached to the email were the two records in unredacted form. Ms. Evans appealed the response to request 12-514 on July 17, 2013. On December 12, 2013, the Park Service again emailed additional documents to Ms. Evans in what it styled a "revised release determination." Some of the nine documents released with this email were responsive to request 12-514, and many were released only in redacted form. The email advised Ms. Evans that she could appeal this response. She appealed the response to request 12-514 again on July 5, 2014, claiming that the Park Service hadn't provided a written response to her first appeal.

*Request 12-999*

In an August 31, 2012 email to the Park Service, Ms. Evans asserted that the response to request 12-514 was deficient. She identified five types of

documents that were referred to by some of the 27 documents the Park Service had released to her on August 28; none of these referenced documents were included in the agency's response to request 12-514. The Park Service again treated this as a new FOIA request, assigning it tracking number NPS-2012-00999 ("request 12-999").

The Park Service issued a partial response to this new request by letter on December 21, 2012, after this suit was filed. This letter said that of the five requested records, two were being released to her, one didn't exist, and one couldn't be located. The remaining record requested was a binder regarding jurisdictional issues. The Park Service included a list of the 77 documents in the binder and released some of them to Ms. Evans, informing her that sixteen of the documents were still under consideration for release. The letter said Ms. Evans was entitled to treat the delayed response to her request as a denial, and could appeal it immediately. On June 19, 2013, the Park Service issued a final response concerning the sixteen remaining documents from the binder. The agency released some of the documents to Ms. Evans in their entirety, and released others in redacted form. The final response letter informed Ms. Evans of her right to appeal the partial denial.

Ms. Evans appealed the response to request 12-999 on July 16, 2013. On December 12, 2013, the Park Service emailed more documents to Ms. Evans, some of which were responsive to request 12-999 but were partially redacted.[2]

---

[2] This email containing additional documents was the same one in which documents responsive to request 12-514 were also released. Because request 12-999 related to documents

This email told Ms. Evans that she could appeal the response. She appealed the response to request 12-999 again on July 4, 2014, claiming that the Park Service hadn't provided a written response to her first appeal.

*Request 12-515*

On April 13, 2012 (the same day she made request 12-514), Ms. Evans made another request for:

> 1. A copy of any Environmental Assessment and/or Environmental Impact Statement relative to the Lakeshore that involves the use of jet skis within the Lakeshore, and any subsequent determinations or findings that the Park Service or the Lakeshore reached relative to the same.
>
> 2. A copy of any Environmental Assessment and/or Environmental Impact Statement relative to the Lakeshore that involves the use of off-road vehicles within the Lakeshore, and any subsequent determinations or findings that NPS or the Lakeshore reached relative to the same.
>
> 3. A copy of the General Agreement, Law Enforcement between the Lakeshore and the Town of Porter.
>
> 4. A copy of the General Agreement, Law Enforcement between the Lakeshore and the Town of Ogden.

The Park Service acknowledged receipt of this request on April 17, 2012, and assigned the request tracking number NPS-2012-00515 ("request 12-515"). The agency issued a final response on August 2, 2012. That response provided the General Agreement between the Lakeshore and Ogden, and stated that no Environmental Assessments or Impact Statements existed. It also stated that "there is currently no general agreement in force between the park and the Town

---

Ms. Evans thought should have been included in the Park Service's response to request 12-514, many of the documents released were responsive to both requests.

of Porter." This letter informed Ms. Evans of her right to appeal. She didn't appeal the partial denial of request 12-515.

*Request 13-60*

On September 1, 2012, Ms. Evans made another request for a copy of an 1830 government land survey of the then-Northwest Territory, as well as the surveyor's field notes. The Park Service originally got this request mixed up with request 12-999, informing Ms. Evans by email on October 19, 2012 that staff were working on a fee estimate for it. Ms. Evans objected by email that fees couldn't be charged because the agency had taken too long to respond to the request.

The Park Service sent Ms. Evans a letter on October 23, 2012 acknowledging receipt of the new request and assigning it tracking number NPS-2013-00060 ("request 13-60"). The agency issued a final response to this request on November 28, 2012, telling Ms. Evans that the actual survey and notes she requested were maintained on record by the State of Indiana. This letter informed Ms. Evans that she had the right to appeal if she considered the Park Service's response to be a denial of her request. Ms. Evans didn't appeal this response.

II. Legal Standard

Summary judgment is proper only if "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In deciding whether a genuine dispute exists as to any material fact, a court must view all the evidence and draw all reasonable inferences in favor of the non-moving party. *See* Weber v. Univ. Research Assoc., Inc., 621 F.3d 589, 592 (7th Cir. 2010). The existence of an alleged factual dispute, by itself, won't defeat a summary judgment motion; "instead, the nonmovant must present definite, competent evidence in rebuttal," Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007). It isn't appropriate for the court to judge the credibility of the witnesses or evaluate the weight of the evidence; the only question on summary judgment is "whether there is a genuine issue of fact." Gonzalez v. City of Elgin, 578 F.3d 526, 529 (7th Cir. 2009). Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005) (internal citations omitted).

Because the question in FOIA cases often involves whether certain undisputed actions by an agency violated statutory requirements, "FOIA cases

typically and appropriately are decided on motions for summary judgment." Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Veterans Affairs, 828 F. Supp. 2d 325, 329-330 (D.D.C. 2011). A court can award summary judgment in such cases solely on the basis of affidavits or declarations from agency employees, so long as they are "relatively detailed and non-conclusory." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal citation omitted). When an agency moves for summary judgment, the essential question is whether "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly [or partially] exempt from the Act's inspection requirements." Goland v. C.I.A., 607 F.2d 339, 352 (D.C. Cir. 1978) (internal citation omitted).

## III. DISCUSSION

Ms. Evans has filed five motions to strike, asking the court to disregard seven of the government's ten exhibits. Before evaluating whether genuine issues of material fact exist, the court must decide what evidence is properly before it by resolving these motions to strike.

### A. Ms. Evans's Motions to Strike

Federal Rule of Civil Procedure 56 provides that an affidavit or declaration offered to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). An affidavit or declaration that contains information that couldn't be

admissible at trial can neither lend support to, nor defeat, a summary judgment motion. *See* <u>Zayre Corp. v. S.M. & R. Co., Inc</u>., 882 F.2d 1145, 1148-1149 (7th Cir. 1989); <u>Palucki v. Sears, Roebuck & Co</u>., 879 F.2d 1568, 1572 (7th Cir. 1989). A court considering a motion to strike should "only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand." <u>Paniaguas v. Aldon Companies, Inc.</u>, No. 2:04 CV 468 PRC, 2006 WL 2568210, at *4 (N.D. Ind. Sept. 5, 2006).

The government asks the court to disregard much of the argument presented in Ms. Evans's motions to strike. The government accuses Ms. Evans of evading this district's page limit on briefs in opposition to summary judgment by placing additional arguments in her motions to strike (and incorporating them by reference in her opposition brief). Under the court's local rules, briefs in opposition to a summary judgment motion "must not exceed 25 pages." N.D. Ind. L.R. 7-1(e)(1). As will be discussed, much of Ms. Evans's argument in her motions to strike effectively supplements her opposition brief rather than legitimately presenting purely evidentiary challenges to the government's exhibits.[3]

A district court is entitled to strictly enforce its local rules regarding summary judgment pleadings, even if enforcement results in a party forfeiting potentially meritorious arguments. *See* <u>Yancick v. Hanna Steel Corp</u>., 653 F.3d 532, 537 (7th Cir. 2011) ("This court has 'routinely held that a district court may

---

[3] Ms. Evans candidly admits that this is the purpose of her motions to strike in her summary judgment opposition brief. (Pl.'s Resp. Mot. Summ. J., at 2) ("Because of the importance of exhaustion of administrative remedies and page limitations, Plaintiff's response is weighed toward the issue of exhaustion. Plaintiff's accompanying motions to strike address certain non-exhaustion issues.").

strictly enforce compliance with its local rules regarding summary judgment motions.'") (*quoting* <u>Schmidt v. Eagle Waste & Recycling, Inc</u>., 599 F.3d 626, 630 (7th Cir. 2010)). Additional pleadings that improperly circumvent page limits are therefore subject to being stricken by the court. *See* <u>Native Am. Arts, Inc. v. Peter Stone Co., U.S.A</u>., No. 08 C 3908, 2015 WL 228209, at *2 (N.D. Ill. Jan. 14, 2015) (striking a defendant's "supplemental" summary judgment brief as an attempt to skirt the court's page limit rules).

To hold the government to the page limitations of the Local Rules yet allow Ms. Evans to evade them would be unfair to the government. Page limits serve an important function: these rules are "designed as much for the benefit of the litigants as for the benefit of the court. If extra pages mean stronger argument, enforcement of the page limit protects those who obey the rules." <u>Morgan v. South Bend Community School Corp</u>., 797 F.2d 471, 480-481 (7th Cir. 1986). Apart from the harm to the government, letting Ms. Evans circumvent the page limits would waste valuable judicial resources by inviting Ms. Evans to take a shotgun approach to opposing summary judgment and make every conceivable argument rather than assisting the court in its task by focusing her pleadings on the critical remaining disputes of fact.[4] Consistent with the local rules, the court will strictly enforce its page limits and will consider arguments raised in Ms. Evans's motions to strike only as they relate to the admissibility issues

---

[4] This isn't merely a hypothetical danger in this case. Ms. Evans's motions to strike total 44 pages of argument – roughly 75% more than permitted for her opposition brief under the Local Rules. While some of the material in the motions to strike goes to admissibility issues, most of those 44 pages consist of merits arguments that belonged in – but would not fit in – Ms. Evan's opposition brief.

raised in those motions. The court won't consider merits arguments raised in the motions to strike when ruling on the summary judgment motion.

Ms. Evans has moved to strike: (1) portions of the declaration of Michael Bremer (Def. Ex. 6); (2) both declarations of Elizabeth McConnell (Def. Exs. 4, 5); (3) both declarations of Patricia Rooney (Def. Exs. 2, 3); (4) the revised *Vaughn* index submitted by the government (Def. Ex. 9); and (5) the declaration of Dana Jacobsen (Def. Ex. 10). The court considers each motion separately below.

### *Defense Exhibit 6: Declaration of Michael Bremer*

Ms. Evans moves to strike several paragraphs of Defense Exhibit 6 – the declaration of Lakeshore Chief Ranger Michael Bremer – on the basis that Mr. Bremer testifies to matters not within his personal knowledge. Mr. Bremer's declaration states that he recommended the Park Service redact most of the Traffic SOP before turning it over to Ms. Evans. His declaration justifies the redaction on the grounds that "the procedures or techniques described below are not well known to the public. [The Park Service] routinely does not release these techniques." (Def. Ex. 6, ¶ 5). Ms. Evans argues that Paragraph 5 isn't based on personal knowledge, because Mr. Bremer isn't qualified to comment on either what the public does (or doesn't) know, or what the Park Service as a whole does (or doesn't do). Ms. Evans also objects to Paragraphs 7 through 12 of the declaration, which list ways in which release of the information in the Traffic SOP could be exploited and mentions possible negative impacts of such

exploitation on park safety, security, and law enforcement.[5] Ms. Evans makes the same objection to all of these paragraphs: that they aren't based on personal knowledge and are speculative, because Mr. Bremer "is not competent or qualified to testify to what the public would or would not do."

A witness can testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. *See* Fed. R. Evid. 602; <u>United States v. Joy</u>, 192 F.3d 761, 767 (7th Cir. 1999). Still, "personal knowledge can include inferences – most of our personal knowledge is inferential." <u>Ani-Deng v. Jeffboat, LLC</u>, 777 F.3d 452, 454 (7th Cir. 2015) (internal citations omitted). Similarly, affidavits can contain a lay witness's opinions, so long as those opinions are "grounded in observation or other first-hand personal experience." <u>Visser v. Packer Eng'g Associates, Inc</u>., 924 F.2d 655, 659 (7th Cir. 1991) (noting that opinions and inferences are permissible in an affidavit but "must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.").

Mr. Bremer's statements in Paragraph 5 are permissible inferences based on his 26 years of personal experience as a Park Service law enforcement officer. His statement that the contents of the Traffic SOP aren't publicly known is a

---

[5] By way of example, Paragraph 9 states that the Traffic SOP contains information on where and how the Park Service officers use traffic enforcement radar in the Lakeshore and states:

> If information contained in this section were to be released to the public it could be used in an attempt to circumvent the law. This would result in a public perception of lawlessness among some drivers seeking to routinely exceed the posted speed limit. The safety of other motorists as well as recreational users of park roads would be jeopardized by this lawless activity. Disclosure of the techniques and procedures NPS commissioned law enforcement officers described in this section could risk circumvention of the law.

(Def. Ex. 6, ¶ 9). The other challenged paragraphs are similar.

permissible inference based on his testimony that in his experience with the Park Service, the Traffic SOP has never been released to the public. Mr. Bremer is also qualified to comment on whether the Park Service routinely releases these sorts of documents. As a long-time employee of the Park Service's law enforcement department, Mr. Bremer has abundant personal experience with the Park Service's disclosure policies and is knowledgeable about which internal law enforcement documents his employer does or does not release publicly. The court denies Ms. Evans's motion to strike Paragraph 5.

With regard to Paragraphs 7-12, Mr. Bremer's assessment of what members of the public could or might do with the information in the Traffic SOP are speculative. While an experienced law enforcement officer might in some cases be able to infer the ways in which criminal behavior could change based on the public release of information, Mr. Bremer's declaration doesn't establish a sufficient basis to support his inferences. Nowhere in the declaration does Mr. Bremer suggest the personal observations or experiences on which this speculation is based; he doesn't, for example, state that he has been involved in such disclosures in the past and saw their repercussions. *See* Visser v. Packer Eng'g Associates, Inc., 924 F.2d 655, 659 (7th Cir. 1991) (holding that district court properly struck affidavits which speculated about an individual's motivations for taking an action, without including "primary facts from which a reasonable person in their position would infer" that the motivation existed). The portions of Paragraphs 7-12 that speculate on the possible future consequences

of disclosure aren't sufficiently "grounded in observation or other first-hand personal experience" to be admissible.[6]

The court therefore GRANTS IN PART AND DENIES IN PART Ms. Evans's motion to strike the declaration of Michael Bremer. The motion is granted with regard to those portions of Paragraphs 7-12 which speculate as to the possible consequences of releasing Traffic SOP information to the public. The motion is denied with regard to the rest of Mr. Bremer's declaration, including the portions of Paragraphs 7-12 that describe the contents of the Traffic SOP.

*Defense Exhibits 4 and 5: Declarations of Elizabeth McConnell*

Ms. Evans also moves to strike Defense Exhibits 4 and 5, two declarations by Lakeshore employee Elizabeth McConnell that describe the search efforts made by the Park Service in response to Ms. Evans's FOIA requests. First, Ms. Evans challenges the declarations in their entirety based on their introductory paragraphs, which include the following language:

> All information herein is based upon my personal knowledge and/or experience and/or my personal review of plaintiff's Freedom of Information Act ("FOIA") requests and documents or upon information furnished to me in my official capacity.

---

[6] In its response to the motion to strike, the government suggests that even if Mr. Bremer's declaration exceeds the scope of permissible lay opinion testimony, he would be qualified as an expert by virtue of his many years as an the Park Service law enforcement officer. To be admissible, however, the opinions of an expert must be "the product of reliable principles and methods" and must be "based on sufficient facts or data." Fed. R. Evid. 702. Mr. Bremer's declaration contains no mention of the facts, data, or methods underlying his speculative predictions about the possible future consequences of disclosing the Traffic SOP. As such, his predictions are inadmissible whether offered as lay or expert testimony.

(Def. Ex. 4, ¶ 1; Def. Ex. 5, ¶ 1). Ms. Evans argues that the final portion of that sentence ("information furnished to me") proves that the contents of the declarations aren't based on Ms. McConnell's personal knowledge. Because these introductory paragraphs qualify the entire declarations, Ms. Evans takes the position that the lack of personal knowledge hinted at infects the declarations in their entirety and renders them wholly inadmissible.

The inclusion of this language at the beginning of both declarations usually is improper, but doesn't justify striking the declarations completely. Parts of the declarations indisputably refer to Ms. McConnell's own personal efforts in searching for records. It would be improper to strike such unquestionably competent and admissible testimony simply due to introductory boilerplate. *See* Charles ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2738 (Civ. 3d ed. 2006) ("The court will disregard only the inadmissible portions of a challenged affidavit and consider the rest of it"). Ms. Evans's motion identifies several specific portions of the declarations that she believes aren't based on personal knowledge, and the court will consider her arguments in light of Ms. McConnell's statement that some of the material in the declaration might be based on information provided to her rather than personal knowledge.

Ms. Evans's second argument for striking the entire declarations relates to some confusion about Ms. McConnell's job title. In her first declaration, Ms. McConnell describes herself as "the FOIA officer of Indiana Dunes National Lakeshore . . . for the past two and one half (2 ½) years." (Def. Ex. 4, ¶ 1). In her

second declaration, Ms. McConnell refers to herself as the "Chief of Administration and Business Services for Indiana Dunes National Lakeshore . . . for the past four (4) years." (Def. Ex. 5, ¶ 1). In Ms. Evans's view, this discrepancy casts doubt on whether Ms. McConnell is actually the FOIA officer for Lakeshore, and so renders her incompetent to testify to FOIA procedures there. Even if Ms. McConnell is in fact a FOIA officer, Ms. Evans argues that the brevity of the time she has held the position -- two and a half years -- means she doesn't have sufficient personal knowledge about Lakeshore FOIA practices and must be "merely repeating hearsay told to her by others" or "stating opinion."

Neither of these contentions has merit. Employees frequently have multiple titles within an office or agency; that Ms. McConnell is the Chief of Administration and Business Services for the Lakeshore in no way precludes her from also being the designated FOIA officer. That she identifies herself by different job titles in her two declarations provides no reason to toss out her testimony. That Ms. McConnell had only been the FOIA officer for two and a half years at the time of her first declaration is also irrelevant. Ms. Evans's first FOIA request was filed in February 2012, and Ms. McConnell's declaration is dated June 2013. Ms. McConnell was, therefore, the FOIA officer for Lakeshore for roughly one year before Ms. Evans even made her requests, and there is no reason to think she wasn't knowledgeable about Lakeshore's FOIA practices throughout the time Ms. Evans requested documents.

Ms. Evans next argues that Ms. McConnell lacks credibility and/or personal knowledge of the documents at issue, because McConnell's first declaration says in Paragraph 10 that only one of the documents Ms. Evans requested had ever been distributed to parties outside the Park Service. Ms. Evans insists that some of the other documents actually had been shared with a U.S. Magistrate Judge or discussed at a public meeting, and the government doesn't directly address whether this alleged disclosure happened.[7] Ms. Evans has offered no authority suggesting that a single factual error (assuming this to be one) in a declaration renders the entire declaration inadmissible. That Ms. McConnell inaccurately claimed some documents weren't released publicly might be reason for a factfinder to question her credibility or assign her testimony less weight, but neither of those considerations undermines the admissibility of her declaration.

Ms. Evans also challenges Paragraphs 4, 8, and 9 of Ms. McConnell's first declaration and Paragraphs 5, 6, and 7 of Ms. McConnell's second declaration. These paragraphs say that eleven staff members at Lakeshore conducted searches for the requested documents, these searches were done in good faith, the Park Service searched the relevant files, and the relevant documents weren't

---

[7] In her motion, Ms. Evans devotes a great number of pixels towards arguing that this misstatement proves that the government's understanding of attorney-client privilege is too broad, and so the government's withholding or redacting of documents in response to her FOIA requests was unreasonable. But as the government correctly notes, these arguments are relevant solely towards the merits of the case, not to the motion to strike. In deciding a motion to strike, the court is concerned solely with the admissibility – not the weight, persuasiveness, or credibility – of evidence. As noted above, the court won't allow circumvention of the summary judgment page limit by considering merits arguments shoehorned into motions to strike. Because arguments about the government's understanding of the FOIA privilege exemptions have no conceivable relevance to the motion to strike, the court disregards them.

found. Ms. Evans argues that these statements "demonstrate a lack of personal knowledge and are unclear, vague, conclusory, and should be struck" because they don't identify which staff members or specific document requests were involved, state legal conclusions, and are based on the search efforts of other staff members about which Ms. McConnell lacks personal knowledge.

As the Lakeshore FOIA officer, Ms. McConnell is competent to testify through personal knowledge regarding what efforts she and her staff undertook in response to Ms. Evans's FOIA requests. That Ms. McConnell didn't specifically name the staff members who helped in the searches doesn't compel a conclusion (or even an inference) that she lacked personal knowledge of the searches she oversaw, and Ms. Evans has identified no precedent in support of her argument that vagueness alone renders otherwise competent testimony inadmissible. Like arguments about the accuracy of Ms. McConnell's declarations, arguments regarding their specificity and level of detail go not to admissibility but to weight; if Ms. Evans thinks the government hasn't adequately described its search efforts, that argument belongs in her response to the summary judgment motion.[8]

---

[8] The cases cited by Ms. Evans in support of striking the declarations aren't on point for this very reason: all involved courts evaluating the sufficiency of affidavits for carrying a party's burden on summary judgment, not deciding threshold admissibility issues on a motion to strike. *See* Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990) (reversing grant of summary judgment because the defendant's affidavits "did not adequately describe the agency's search."); Weisberg v. U.S. Dep't of Justice, 627 F.2d 365, 371 (D.C. Cir. 1980) (reversing grant of summary judgment, because agency affidavits did not "denote which files were searched or by whom, [did] not reflect any systematic approach to document location, and [did] not provide information specific enough to enable [the plaintiff] to challenge the procedures utilized."); Kean v. Nat'l Aeronautics & Space Admin., 480 F. Supp. 2d 150, 157 (D.D.C. 2007) (finding agency declarations "inadequate to satisfy defendant's burden at summary judgment because they fail to 'describe in any detail what records were searched, by whom, and through what process.'") (quoting Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 551-552 (D.C. Cir. 1994)).

Ms. Evans cites to <u>Bright v. Ashcroft</u>, 259 F. Supp. 2d 494, 498 (E.D. La. 2003), for the proposition that a court can strike portions of an affidavit that aren't based on personal knowledge or constitute improper opinion testimony. In <u>Bright</u>, however, the court struck the affidavit of a high-level FBI official based in Washington D.C. because his testimony concerned topics – such as the identity of a confidential source and the conduct and thought processes of other agents in a field-level investigation in New Orleans – about which the official could not have had personal knowledge. Ms. Evans identifies no comparable testimony in Ms. McConnell's declarations. As a Lakeshore employee and FOIA officer, she had adequate first-hand knowledge of the investigation her office undertook in response to Ms. Evans's requests for documents. Nowhere in her declarations does she opine on the state of mind of others or describe events in which she didn't participate. The only arguably improper portion of the declarations is Paragraph 4 of the first declaration, in which Ms. McConnell states that the searches were conducted "in good faith" and were "reasonably calculated to uncover all relevant documents." These statements represent legal conclusions rather than factual testimony, and the court will therefore strike these statements from Defense Exhibit 4.

Finally, Ms. Evans argues that Ms. McConnell's declarations show bad faith, insofar as statements in them conflict with later statements by the government or with the facts as Ms. Evans understands them. This section of the motion isn't a motion to strike; it doesn't ask the court to strike Ms. McConnell's declaration on this basis, instead merely asserting that bad faith exists and that "Plaintiff

wishes to understand why she was not given these documents." As noted above, a litigant can't escape this court's page limits on briefs in opposition to summary judgment simply by treating motions to strike as addenda in which to raise merits arguments that wouldn't fit in a response brief. The arguments regarding bad faith are irrelevant to a motion to strike and the court will disregard them.

For the reasons above, the court GRANTS IN PART AND DENIES IN PART Ms. Evans's motion to strike Elizabeth McConnell's declarations. The motion is denied with regard to all portions of the declarations other than the sentence "These searches were conducted in good faith and were reasonably calculated to uncover all relevant documents" in Paragraph 4 of the Defense Exhibit 4, which is stricken as an improper legal conclusion.

*Defense Exhibits 2 and 3: Declarations of Patricia Rooney*

Ms. Evans also moves to strike Defense Exhibits 2 and 3, two declarations by Patricia Rooney, a Park Service employee responsible for managing the agency's Midwest Region FOIA program.

Many of Ms. Evans's arguments for striking Ms. Rooney's declarations are the same as her arguments for striking Ms. McConnell's declarations, so they can be disposed of briefly. Ms. Rooney's declarations begin with the same precatory language as Ms. McConnell's, including the statement that the information in the declarations is based on her personal knowledge "and/or experience and/or [her] personal review of plaintiffs' FOIA requests and documents or upon information furnished to [her] in [her] official capacity." (Def.

Ex. 2, ¶ 1). As already noted, this language does not render the declaration inadmissible absent some indication that specific statements in it are not based on personal knowledge. Ms. Evans also argues that several parts of Ms. Rooney's declarations are vague, indicative of bad-faith, or inconsistent with other evidence in the record such that they raise questions about Ms. Rooney's credibility. These arguments go to the weight of the challenged evidence rather than its admissibility, and present no basis for striking otherwise admissible testimony.

Ms. Evans makes two new arguments specific to Ms. Rooney's declarations. First, Ms. Evans takes issue with the part of Defense Exhibit 2 that lists statistics about how many FOIA requests the Park Service's Midwest Region receives and how many requests Ms. Evans herself has submitted in the past.[9] Ms. Evans argues that this information has no relevance to this case and that it is unfairly prejudicial to her, as "Defendants appear to be deriding Plaintiff for exercising her legal right to request information from her government by painting her as a frequent requester." (Pl.'s Mot. Strike Rooney, at 2).

Evidence is relevant if it "has a tendency to make a fact more or less probable that it would be without the evidence" and that fact "is of consequence

---

[9] The relevant portion of the declaration is:

In Fiscal Year 2012, NPS Midwest Regional office received 59 FOIA requests, of which processing has been completed on 50. To date in Fiscal Year 2013, the regional office has received 39 requests, of which processing has been completed on 30. Mrs. Evans submitted 5 of the 59 requests (8%) received in FY 2012 and 4 of the 39 requests (10%) received in FY 2013; processing has been completed on 4 of Ms. Evans's FY 2012 requests (80% of her requests and 8% of the total for the year), and on 3 of Ms. Evans's FY 2013 requests (75% of her requests and 10% of the total for the year).

(Def. Ex. 2, ¶ 2).

in determining the action." Fed. R. Evid. 401. Irrelevant evidence is generally not admissible. Fed. R. Evid. 402. The "low relevance threshold" is easy to satisfy, and the Rules reflect a policy generally in favor of admission. *See* <u>United States v. Boros</u>, 668 F.3d 901, 907 (7th Cir. 2012) ("A party faces a significant obstacle in arguing that evidence should be barred because it is not relevant"). Under Rule 403, even relevant evidence can be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice. Fed. R. Evid. 403.

The evidence of the Midwest Region's general FOIA workload is relevant, given that Ms. Evans asks the court to find bad faith based on the Park Service's delay in responding to her requests. A large number of FOIA requests doesn't excuse an agency from complying with the statute's deadlines, but it lends some credence to the agency's claim that long delays flow from understaffing rather than malice. Ms. Rooney's testimony about Ms. Evans's own history of FOIA requests is of more questionable relevance, but the fact that the agency has processed Ms. Evans's requests in the past similarly has some arguable relevance to whether the Park Service's responses to the requests in this suit was made in bad faith. It isn't entirely clear why Ms. Evans thinks this evidence of her relatively modest history of FOIA requests – a total of nine requests over a two-year period – is in any way prejudicial to her. As she herself states, making FOIA requests of a government agency is a citizen's right under federal law. That she has exercised this right doesn't reflect poorly on her such that the relevance

of this fact is substantially outweighed by its unfair prejudice to her. The court won't strike Ms. Rooney's testimony on relevance or prejudice grounds.

Finally, Ms. Evans argues that two specific portions of Ms. Rooney's testimony aren't based on personal knowledge. Ms. Rooney's first declaration stated that she "coordinated the search for and the review of documents responsive to the plaintiff's nearly half dozen FOIA requests relating to various subject areas." (Def. Ex. 2, ¶ 3). Ms. Evans insists that because there are exactly six FOIA requests at issue in this suit, the use of the phrase "*nearly* half dozen" suggests that Ms. Rooney didn't oversee all of the relevant requests and justifies striking any statements in the declaration that don't clearly specify which request they refer to. This argument is frivolous. Ms. Rooney testifies that she coordinated the responses to "the FOIA requests that are the basis of this litigation," and a single marginally imprecise numerical statement does not undermine Ms. Rooney's testimony that she handled the requests at issue.

Ms. Evans also argues that Ms. Rooney lacks personal knowledge with regard to two specific statements in the declarations. In her first declaration, Ms. Rooney testified that searches performed by five named Park Service employees "encompassed both paper records and electronic records" and "were done by various Lakeshore staff." (Def. Ex. 2, ¶ 7). In her second declaration, Ms. Rooney testified that "Relative to NPS-2012-00513, Lakeshore staff were unable to locate three of the four records requested." (Def. Ex. 3, ¶ 6). Ms. Evans argues that Ms. Rooney lacked the personal knowledge of these searches necessary to make such statements, because elsewhere in her declarations she states: "Because the

Lakeshore conducted the search of the Lakeshore's files, I am not in a position to know what files were searched by Lakeshore staff." (Def. Ex. 3, ¶ 4).

Ms. Rooney coordinated these searches, giving rise to an inference that she has personal knowledge of what broad types of files were searched and who performed the searches, even if she did not know the specific files searched. Ms. Rooney makes clear that she requested specific records related to request 2012-00513, and that Lakeshore staff responded to her request by providing some documents and indicating that others could not be located. Ms. Rooney is competent in her role as Park Service Midwest Region's FOIA administrator to testify as to the result of those searches as provided to her by Lakeshore staff.

For the reasons above, the court DENIES Ms. Evans's motion to strike the declarations of Patricia Rooney.

*Defense Exhibit 9: Revised Vaughn Index*

Ms. Evans also moves to strike Defense Exhibit 9, the revised *Vaughn* index prepared by the government. A *Vaughn* index (named for Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973)) is an index prepared when an agency withholds material relevant to a FOIA request, which lists each withheld document and states the FOIA exemption that the agency asserts is applicable to that document. *See* Solar Sources, Inc. v. United States, 142 F.3d 1033, 1039 (7th Cir. 1998); Wright v. OSHA, 822 F.2d 642, 645 (7th Cir. 1987).

Ms. Evans first argues that no foundation has been laid for the revised *Vaughn* index, because unlike the five previous indices the government provided

to Ms. Evans, the most recent was filed without an accompanying affidavit identifying who prepared it. After Ms. Evans filed her motion, the government acknowledged the oversight and moved for leave to file a supplemental exhibit consisting of a declaration by Department of the Interior attorney Dana Jacobsen. The court granted this motion and Ms. Jacobsen's declaration has been filed as Defense Exhibit 10. Ms. Jacobsen's declaration states that she and Ms. Rooney prepared the revised *Vaughn* index together, and that the index is an accurate description of the documents withheld from the responses to Ms. Evans's FOIA requests. In light of the supplemental declaration, Ms. Evans's arguments regarding lack of foundation are moot.

Ms. Evans's remaining arguments about the *Vaughn* index include that it: (1) contains "organizational issues" that Ms. Evans thinks make the index confusing; (2) contains various errors, including misspellings and incorrect dates and sender names; (3) doesn't adequately describe how disclosure of withheld documents would harm the interests protected by the claimed exemptions; (4) doesn't include an accompanying declaration stating that all nonexempt material has been released; (5) is supported by the "dated" declaration of Ms. Rooney which is over one year old; and (6) doesn't satisfy the requirements for withholding documents under the attorney-client and deliberative process privileges.

Once again, these are merits arguments with no clear connection to admissibility; Ms. Evans essentially argues that the index is insufficient to carry the government's burden on summary judgment, that the court should not credit

it, and that the government wasn't entitled to withhold the documents identified in it. The issue on a motion to strike is admissibility, and evidence isn't made inadmissible by virtue of being inaccurate, untrustworthy, or noncompliant with a statutory requirement under FOIA.[10]

The court DENIES Ms. Evans's motion to strike the revised *Vaughn* index.

*Defense Exhibit 10: Declaration of Dana Jacobsen*

Finally, Ms. Evans moves to strike the declaration of Dana Jacobsen; as already explained, the government submitted Ms. Jacobsen's declaration to cure the foundational defects with the revised *Vaughn* index that Ms. Evans identified in her motion to strike that index.

Ms. Evans first "questions the convenience of Jacobsen now stepping forward to state that the Revised Vaughn Index was prepared by her and Rooney." A party's suspicion that a declarant is lying isn't a basis for striking that declaration: any argument about allegedly suspicious timing goes to the weight of the evidence rather than its admissibility. In a related vein, Ms. Evans argues that "Jacobsen's declaration should be struck, and her testimony discredited" because the declaration attests to the accuracy of an index that Ms. Evans believes contains errors. Again, arguments that testimony isn't credible

---

[10] Ms. Evans has again identified no cases to support her argument that the issues of which she complains justify striking a *Vaughn* index. Indeed, the court's own research has not turned up a single case in which a federal court even considered – much less granted – a motion to strike a *Vaughn* index for any of the reasons Ms. Evans identifies. The only case of which the court is aware in which a *Vaughn* index was struck for any reason involved untimeliness issues not presented here, and that case was overturned on appeal. *See* <u>Coastal States Gas Corp. v. Dep't of Energy</u>, 495 F. Supp. 1172, 1176 (D. Del. 1980) *vacated*, 644 F.2d 969 (3d Cir. 1981).

or consistent with other evidence go not to admissibility but to weight. The court DENIES Ms. Evans's motion to strike the declaration of Dana Jacobsen.

## B. Summary Judgment Merits

Congress enacted FOIA with the purpose of promoting government transparency. *See* 5 U.S.C. § 552; Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 171–172 (2004) (describing FOIA as "a means for citizens to know what their Government is up to") (citation and internal quotation marks omitted). With this view in mind, FOIA requires federal agencies to search for and release almost any agency record upon a citizen's request. *See* 5 U.S.C. § 552(a)(3)(A). FOIA authorizes federal district courts to enforce this mandate by empowering them to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). When a FOIA requester files a civil action challenging an agency's response to his or her document request, the agency generally bears the burden of demonstrating that its response to the request was appropriate. *See* U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press, 489 U.S. 749, 755 ("Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden on the agency to sustain its action") (internal quotation marks omitted).

Ms. Evans's amended complaint includes six causes of action, which allege that: (1) the *Vaughn* indexes produced by the government are deficient; (2) the

government's search for documents in response to her FOIA requests was inadequate; (3) the government improperly redacted portions of the documents it released based on Exemption 5, FOIA's attorney-client and deliberative process privileges; (4) the government wrongfully withheld documents based on Exemption 7, FOIA's exemption protecting law enforcement investigations and procedures; (5) the government didn't adequately segregate exempt from non-exempt portions of documents and so redacted documents too broadly; and (6) the government unreasonably delayed releasing documents in response to Ms. Evans's requests. Ms. Evans seeks a court order directing the government to produce all the documents she requests, an injunction prohibiting the government from "ignoring FOIA's deadlines and mandates," a written finding under 5 U.S.C. § 552(a)(4)(F) that the government acted unreasonably, arbitrarily, and capriciously in withholding the documents at issue, and an award of fees and costs under 5 U.S.C. § 552(a)(4)(E).

The government seeks summary judgment on all of Ms. Evans's claims. It argues that Ms. Evans's claims about the adequacy of the Park Service's search must be dismissed because Ms. Evans didn't exhaust her administrative remedies for such claims before filing suit. It also argues that no cause of action can be maintained for a deficient *Vaughn* index or for delays in a FOIA response, that its use of Exemptions 5 and 7 to redact documents was proper, and that the redactions at issue weren't overbroad. The court considers each of these arguments in turn, and agrees that the government is entitled to summary judgment on all of Ms. Evans's claims.

*Failure to Exhaust*

A FOIA requester must exhaust the available administrative remedies by appealing an agency's FOIA response within that agency before seeking judicial review. *See* <u>Hidalgo v. FBI</u>, 344 F.3d 1256, 1258–1259 (D.C. Cir. 2003). Failure to properly exhaust administrative remedies is grounds for dismissal of a requester's lawsuit. *See* <u>Marino v. Dep't of Justice</u>, 993 F. Supp. 2d 1, 11 (D.D.C. 2013); <u>Dale v. I.R.S.</u>, 238 F. Supp. 2d 99, 103 (D.D.C. 2002). In addition to actually filing an appeal with the agency, a requester may be deemed to have constructively exhausted administrative remedies where the agency misses certain statutory deadlines for responding to a FOIA request. *See* 5 U.S.C.A. § 552(a)(6)(C)(i) ("Any person making a request to any agency for records . . . shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph.").

Ms. Evans never filed an administrative appeal regarding requests 12-513, 12-515, and 13-60. The government submits that Ms. Evans never gave the Park Service a chance to fully adjudicate these requests internally, and her failure to exhaust these remedies dooms any claim she might raise regarding these three FOIA requests. Ms. Evans argues that these requests are subject to constructive exhaustion because the Park Service didn't respond to her requests within the statutory time limits. Specifically, 5 U.S.C. § 552(a)(6)(A)(i) requires an agency to

"determine within 20 [business] days . . . whether to comply" with a FOIA request and inform the requester of both the decision and his or her right to appeal.

Ms. Evans is correct that the Park Service's responses were untimely with regard to each of the three requests at issue. For requests 12-513 and 12-515, Ms. Evans made her initial requests on April 6, 2012 and April 13, 2012 respectively, but the Park Service issued a final response to both requests on August 2, 2012 – roughly four months later, and well outside the 20-day window FOIA provides. Similarly, request 13-60 was made on September 1, 2012, and the Park Service didn't respond until November 28, 2012. Under FOIA's statutory scheme, the Park Service's failure to meet its obligations meant that Ms. Evans was entitled to immediately file suit once the statutory deadlines for a response had passed.

But Ms. Evans didn't file suit immediately after the agency's nonresponse; she waited until a response came in, then filed suit without appealing it. While FOIA "allows immediate recourse to the courts" after an agency doesn't make a timely response, "once the agency responds to the FOIA request, the requester must exhaust his administrative remedies before seeking judicial review." Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 64 (D.C. Cir. 1990). A FOIA requester who chooses to wait for an untimely response rather than immediately filing suit does so at the risk of losing the right to bypass the administrative appeal process; as long as the agency responds before a suit is filed, the exhaustion requirement is revived and appeal to the agency is again mandatory. *See* Oglesby v. Army, 920 F.2d at 63 (holding that "an administrative appeal is mandatory if the agency

cures its failure to respond within the statutory period by responding to the FOIA request before suit is filed."). Other courts have consistently followed the approach in <u>Oglesby</u>, including district courts in this circuit. *See, e.g.,* <u>Nelson v. U.S. Army</u>, No. 12 C 4718, 2013 WL 5376650, at *6 (N.D. Ill. Sept. 25, 2013) ("Regardless of the timeliness of the Army's initial response to Plaintiff's FOIA requests, Plaintiff has also failed to constructively exhaust his administrative remedies, as Defendant issued its IDA decision . . . prior to Plaintiff's filing suit"); <u>Goulding v. I.R.S.</u>, No. 97 C 5628, 1998 WL 325202, at *8 (N.D. Ill. June 8, 1998) ("When an agency fails to comply in a timely fashion to a proper FOIA request, it may not insist on actual exhaustion of administrative remedies *unless the agency responds to the request before suit is filed.*") (emphasis added); <u>Almy v. Dep't of Justice</u>, No. 2:90-CV-362, 1995 WL 476255, at *5-6 (N.D. Ind. Apr. 13, 1995) (citing <u>Oglesby</u> and dismissing non-exhausted claims, because "as [the requester] failed to actually exhaust his administrative remedies . . . even though he received belated responses on these requests, this Court lacks subject matter jurisdiction").

Once Ms. Evans allowed the Park Service to make a final response, she was obliged to appeal that response internally before filing suit. Ms. Evans suggests that the D.C. Circuit's holding in <u>Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n</u>, 711 F.3d 180, 184-185 (D.C. Cir. 2013) changed the law in a way that excuses her from the exhaustion requirement permanently once the agency misses a deadline. *See* <u>Citizens v. FEC</u>, 711 F.3d at 189-190 ("if the agency does not adhere to FOIA's explicit timelines, the

'penalty' is that the agency cannot rely on the administrative exhaustion requirement to keep cases from getting into court."). In Citizens, the FOIA requester filed suit immediately once the agency had missed its deadline for responding; the agency issued an appealable response only after litigation had begun in the district court, and the D.C. Circuit held that under those circumstances the agency couldn't move to dismiss the suit for failure to exhaust. Oglesby and Citizens, then, deal with different situations; the first applies where the agency misses a deadline yet the requester waits for an untimely response before suing, while the latter controls when a requester files suit without waiting for a response. Because Ms. Evans didn't file this lawsuit until after the Park Service had issued an appealable final response to the three requests at issue, any claim she raises premised on the Park Service's response to those requests must be dismissed for failure to exhaust administrative remedies.

Ms. Evans filed an administrative appeal regarding the Park Service's response to request 12-514. The government contends that claims regarding this request must also be dismissed because Ms. Evans's appeal was untimely. The Department of the Interior's FOIA regulations in effect when Ms. Evans made her requests provided that a requester must file an administrative appeal of a FOIA response no later than 30 business days after the agency's final response. *See* 43 CFR § 2.29(a) (2012). A "final response" for purposes of starting the appeal time limit is one that includes the agency's decision whether to comply with the FOIA request, the reasons for that decision, and a notice of the right to appeal

that decision to the head of the agency. *See* <u>Oglesby v. U.S. Dep't of Army</u>, 920 F.2d 57, 65 (D.C. Cir. 1990).

Ms. Evans made request 12-514 on April 13, 2012, the Park Service partially responded on August 28, 2012, and then the Park Service issued a letter purporting to be a "final response" on September 27, 2012. This letter met the requirements necessary to trigger the exhaustion requirement. It communicated that the Park Service would release one of the fifteen documents at issue in full, release another with redactions, and withhold the final thirteen documents. The letter gave reasons for the redacted and withheld documents, and it notified Ms. Evans of her right to appeal. Ms. Evans didn't file a timely appeal of this denial; she appealed the Park Service's response on July 17, 2013, after she had already filed suit. Because Ms. Evans was informed of the 30-day appeal window in the Park Service's final response to request 12-514 but didn't timely appeal the agency's decision, she hasn't exhausted her remedies relative to the September 27, 2012 final response.

Ms. Evans makes three arguments in response to the contention that her appeal of request 12-514 was untimely. First, she argues that because FOIA establishes a requester's "right to appeal," an agency can't curtail that right by enacting regulations that limit that right (such as the time limit provisions at issue here). She cites no authority supporting her assertion that validly enacted agency regulations can't regulate the appeals process by establishing time limits, and her argument ignores the many cases in which courts have specifically recognized that an agency can enforce its requirement that a requester timely

exhaust his or her appeals. *See, e.g.*, Wilbur v. C.I.A., 355 F.3d 675, 676 (D.C. Cir. 2004) (noting that "a [FOIA] requester . . . must file an administrative appeal within the time limit specified in an agency's FOIA regulations or face dismissal of any lawsuit complaining about the agency's response.") (internal quotation marks and citation omitted); Citizens For Responsibility & Ethics in Washington v. Dep't of Interior, 503 F. Supp. 2d 88, 98 (D.D.C. 2007) (holding "indisputably untimely" a requester's appeal filed outside the Department of the Interior's 30-day limit).

Second, Ms. Evans argues that the appeal notices in the agency's final responses to her various requests were "confusing" and internally inconsistent, excusing her compliance with the 30-day limit. She points out that in addition to stating "Your appeal must be received no later than 30 workdays after the date of this letter," some of the response letters also stated that she "may file an appeal for nonresponse at any time after the statutory time limit" for the agency's response. These statements are in no way confusing or inconsistent; they make clear that while appeals from an agency's *response* must be received within 30 days, a requester may appeal a *non-response* at any time after the agency's response was due. In other words, if the Park Service hadn't issued a response at all, Ms. Evans was free to appeal even if it had been longer than 30 days since the agency's response was due. After she waited for and received an untimely agency response, however, Ms. Evans was obliged to abide by the 30-day time limit and promptly appeal.

Finally, Ms. Evans notes that the Park Service's "final" response of September 27, 2012 didn't actually prove to be final; the agency made two "revised release determinations" on July 3, 2013 and December 12, 2013, both after Ms. Evans had filed suit. The first of these new determinations stated that the agency had reconsidered and was releasing in full two of the documents it had previously withheld. The second released nine more documents, though many of these had redactions. As Ms. Evans sees it, the Park Service's release of additional documents after this litigation began means that the agency must have reviewed all the documents again and come to a new determination; that the Park Service decided to release some previously withheld documents means the agency implicitly decided anew to withhold the others, and this adverse determination resets the appeals clock such that Ms. Evans's July 17, 2013 appeal was timely.

Ms. Evans cites no support for her contention that any later partial revision of an agency's decision can revive claims that a requester hasn't timely exhausted, and nothing in the statute or the Department of the Interior's implementing regulations suggests that an agency's revisiting of a denied request excuses a requester from the requirement of timely appealing the initial denial. That the statute doesn't provide for this result is unsurprising: it would create a strong disincentive for agencies to negotiate in good faith and attempt to settle – or avert – lawsuits with compromise disclosures. Were Ms. Evans's view correct, once a requester neglects to appeal an adverse decision in timely fashion, the agency would be foolish to revisit and release any documents even if it decided

they had been wrongly withheld; to do so would open the agency to a lawsuit it might otherwise have escaped at the motion to dismiss stage on non-exhaustion grounds. Given FOIA's strong policy preference in favor of disclosure and open government, it's unlikely that Congress intended Ms. Evans's interpretation that would penalize agencies for correcting their mistakes and making previously denied disclosures.

If Ms. Evans took issue with the Park Service's refusal to release the thirteen documents withheld by the September 27, 2012 letter, she was required to timely appeal that refusal. That the Park Service later changed its mind and released some of those documents doesn't change the fact that Ms. Evans had her chance to contest the withholding and didn't do so. Ms. Evans's claims regarding request 12-514 that concern the adequacy of the search or the Park Service's decision to withhold documents weren't timely appealed and so are not properly exhausted. Still, because the documents released in the July 2013 and December 2013 revised determination were not released as of the September 2012 "final response," Ms. Evans had no opportunity to contest the *redactions* in those documents until their release. As such, Ms. Evans's appeal regarding the extent of redactions in those documents was timely, and those claims are properly before the court.

The government is entitled to summary judgment on all of Ms. Evans's claims regarding requests 12-513, 12-515, and 13-60 because she didn't exhaust her administrative remedies by appealing those requests. The government is also entitled to summary judgment on Ms. Evans's claims about

the adequacy of the search and the initial withholding decision as to request 12-514, because Ms. Evans's appeal of those determinations was untimely. Remaining before the court, then, are her claims about requests 12-999 and 12-360 and about the extent of redaction in the documents released in the two revised determinations on request 12-514.

*Deficient Vaughn Index*

Count I of Ms. Evans's amended complaint alleges that "Defendants' Vaughn Indexes are deficient, as Defendants have not fully identified each record with sufficient detail or clarity nor explained how the disclosure of those records would foreseeably harm the interests protected by the claimed exemption." The government asks the court to grant summary judgment on Count I on the basis that there is no cause of action for an allegedly inadequate *Vaughn* index. Ms. Evans responds that under 5 U.S.C. § 552(a)(6)(A)(i), an agency must explain the reasons for its decision to withhold or redact documents. The *Vaughn* index does this, and so must do it adequately.

The court agrees with the government. A *Vaughn* index is not a disclosure to requesters mandated by FOIA; it is an evidentiary tool by which the government seeks to justify its rationale for nondisclosure to the district court in a lawsuit. It is the agency's rationales for nondisclosure themselves – not the index that lists them – that must be evaluated for compliance with FOIA. The *Vaughn* index summarizes and clarifies an agency's reasoning, but it isn't the only source from which the court can evaluate that reasoning. Declarations and

affidavits from agency officials as well as the agency's written responses to FOIA requests might adequately explain the agency's reasons for nondisclosure even without a *Vaughn* index. Indeed, a *Vaughn* index isn't automatically required, and courts can and do decline to require the government to provide one at all. *See* <u>Solar Sources, Inc. v. United States</u>, 142 F.3d 1033, 1040 (7th Cir. 1998) (finding no error where district court refused to compel agency to create a *Vaughn* index).

It follows that a deficient *Vaughn* index in and of itself doesn't give rise to a cause of action as long as the agency's reasons for the actual nondisclosures themselves are otherwise adequate. Ms. Evans's arguments that the *Vaughn* index in this case is deficient essentially duplicate her claims that the government improperly withheld or redacted documents. Accordingly, the court grants summary judgment in favor of the government on Count I of Ms. Evans's complaint.

## *Deficient Search*

Count II of Ms. Evans's amended complaint asserts that the Park Service's search for documents in response to her FOIA requests was deficient. As already noted, Ms. Evans's claims regarding the adequacy of the search in response to requests 12-513, 12-514, 12-515, and 13-60 weren't exhausted and are dismissed for that reason. That leaves only her claims regarding the Park Service's search in regard to requests 12-360 and 12-999.

The government is entitled to summary judgment with regard to request 12-360, because Ms. Evans's appeal of that request didn't raise issues about the adequacy of the search; she challenged only the redactions made to the Traffic SOP under FOIA Exemption 7. (*See* Doc. No. 29-1, Ex. 9) (stating that Ms. Evans would like to appeal the partial denial of request 12-360 on the grounds that the Park Service "has not adequately demonstrated that its withholding of information is justified under Exemption 7(e)" and has "failed to segregate material that may be properly disclosed as its redaction of material was overly broad," and making no mention of inadequate search). Because she didn't present an inadequate search claim regarding request 12-360 to the agency through the appeals process, she hasn't exhausted such a claim.

As noted above, request 12-999 asked for four specific documents plus a binder containing the contents of a file folder. The Park Service responded by producing two of the documents and the binder (though in redacted form), so Ms. Evans can hardly complain that the search for these was inadequate. Of the other two documents Ms. Evans requested, one was in regard to a March 10, 2009 Lakeshore memorandum. The memorandum (which Ms. Evans had) mentioned the need for "a definitive response from the Regional Solicitor's Office" about jurisdiction over the Lakeshore, and in request 12-999 Ms. Evans asked for a copy of this definitive response. The Park Service answered that what Ms. Evans sought didn't exist, as the Solicitor never made a response. Ms. Evans asserts that the nature of the memorandum "makes it difficult to believe that the Regional Solicitor's Office did not provide some answer in response." (Am.

Compl., ¶ 72). Because Ms. Evans thinks the response must exist and the Park Service didn't locate it, she claims that the search for the response must have been inadequate.

The government is entitled to summary judgment on this claim because the unrebutted evidence in the record confirms that the document Ms. Evans wants doesn't exist. Dana Jacobsen, the Assistant Regional Solicitor in the Rocky Mountains Regional Solicitor's Office, testifies in a declaration that her duties include supervising work from the Midwest Region of the Park Service. She then states under penalty of perjury that "[t]his office has not responded to the [Park Services'] March 10, 2009 request for legal opinion on jurisdictional issues." (Def. Ex. 8, ¶ 2). Ms. Evans's suspicion that the document must exist, standing alone, is insufficient to rebut this unambiguous denial by a person competent to testify on the matter. *See* <u>Ferranti v. Bureau of Alcohol, Tobacco & Firearms</u>, 177 F. Supp. 2d 41, 48 (D.D.C. 2001) ("speculation that other documents might exist that are possibly responsive to the request is insufficient to overcome summary judgment.").

The only remaining claim Ms. Evans might raise about the adequacy of the Park Service's search efforts relates to the last document she asked for in request 12-999. Ms. Evans had requested a copy of a September 16, 2008 email to the Regional Chief Ranger of the Park Service's Midwest Region. This email was mentioned in the March 10, 2009 memorandum noted above, but the Park Service told Ms. Evans that:

> Both park and regional office staffs were unable to locate a copy of the email cited in conducting a reasonable search, which included park

management office files, regional office law enforcement specialist files, and regional office central files.

(Doc. No. 29-1, Ex. 41). The Park Service relies on the affidavits it has submitted to show that the agency's search was adequate, and Ms. Evans responds that the affidavits are too vague and conclusory about the search methods to carry the government's burden at summary judgment.

Summary judgment is appropriate when an agency demonstrates that no material facts are in dispute and that it in good faith conducted a search of records that was reasonably calculated to uncover all relevant information. *See* Weisberg v. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984). Good faith is presumed, and can also be bolstered by evidence of the agency's diligent efforts to satisfy the request. *See* SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991). Whether an agency's search was reasonably calculated to uncover relevant information is a context-dependent inquiry. *See* Davis v. Dep't of Justice, 460 F.3d 92, 103 (D.C. Cir. 2006) ("[T]he adequacy of an agency's search is measured by a standard of reasonableness, and is dependent upon the circumstances of the case.") (internal quotation marks omitted). Accordingly, the adequacy of a search is not determined by its results, but by the method of the search itself. *See* Weisberg v. Justice, 745 F.2d at 1485. That an agency failed to find a particular document requested doesn't mean that the search the agency undertook was inadequate. *See* Wilbur v. C.I.A., 355 F.3d 675, 678 (D.C. Cir. 2004) ("Contrary to Wilbur's assertion on appeal, the fact that responsive

documents once existed does not mean that they remain in the CIA's custody today or that the CIA had a duty under FOIA to retain the records.").

The agency can make the required showing by providing "reasonably detailed nonconclusory affidavits submitted in good faith" to explain how the search was conducted. Matter of Wade, 969 F.2d 241, 249 n.11 (7th Cir. 1992). The FOIA requester can then present "countervailing evidence as to the adequacy of the agency's search." Iturralde v. Comptroller of Currency, 315 F.3d 311, 314 (D.C. Cir. 2003) (internal quotation marks omitted). When the requester presents no evidence to the contrary, affidavits or declarations reflecting a reasonable, good faith search are sufficient to demonstrate an agency's compliance with FOIA. See Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982) (holding that "in the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice"). The agency won't be denied summary judgment simply because a better search could be imagined, because the court only decides whether the search was reasonable. See Rubman v. U.S. Citizenship & Immigration Servs., No. 14-3733, 2015 WL 5093074, at *4 (7th Cir. Aug. 31, 2015) ("Importantly, the question at summary judgment is not whether the agency *might* have additional, unidentified responsive documents in its possession.") (emphasis in original).

The government is entitled to summary judgment on the question of whether the search for the missing email responsive to request 12-999 was adequate. The government has submitted two affidavits from Patricia Rooney

that detail search efforts by the Park Service regional staff.[11] Ms. Rooney coordinated the search for and review of documents in relation to Ms. Evans's requests on behalf of the Park Service's Midwest Regional Office. She names the members of the Midwest Regional Office staff who helped her search, explains that both paper and electronic records were searched, and specifies that she searched both Midwest Regional Law Enforcement files and the office's central files. Her declaration states that she asked two named Park Service staff members to "search specifically for two email messages requested under NPS-2014-00999, because they were reportedly addressed to the MWR Chief Ranger" but that those staff members responded that only one of the two emails could be located (Def. Ex. 3, ¶ 3). Ms. Rooney also addressed questions in the Amended Complaint about whether the files of the Regional Director and Assistant Regional Director of her office were not searched, stating that "[s]eparate subject matter files are generally not maintained" at the senior management levels, and "[j]urisdictional issues are generally understood within the agency to fall within the purview of Operations, and more specifically, Law Enforcement." (Def. Ex. 3, ¶ 2). In light of this uncontroverted testimony about the Park Service's recordkeeping practices, the location most likely to have the requested email was the Midwest Regional Office's Law Enforcement files. Those files were searched.

---

[11] Since the recipient of the alleged email was Chief Ranger of the Park Service's Midwest Region, the search of the regional office files was more relevant than the search of Lakeshore files. Nonetheless, Ms. McConnell's declarations also adequately set forth the locations of files searched and the scope of the search efforts.

Ms. Rooney identified the locations of the search, named the personnel involved, described where the missing email would most likely be found in light of the Park Service's recordkeeping practices, and explained that the email wasn't in those records. Her declarations satisfy the government's burden of showing that the search for the missing email was conducted reasonably and in good faith. *See* Ferranti v. Bureau of Alcohol, Tobacco & Firearms, 177 F. Supp. 2d 41, 47 (D.D.C. 2001) ("Affidavits that include search methods, locations of specific files searched, descriptions of searches of all files likely to contain responsive documents, and names of agency personnel conducting the search are considered sufficient."). That nearly all of the records Ms. Evans asked for in her six FOIA requests were ultimately found reinforces this conclusion.

The government is entitled to summary judgment on Count II of the amended complaint as it relates to all six of the Ms. Evans's FOIA requests.

## *FOIA Exemption 5*

Count III of Ms. Evans's complaint charges that the Park Service wrongly withheld as privileged portions of several documents that don't fit the criteria of Exemption 5 of FOIA. FOIA requires federal agencies to release any relevant records unless an enumerated exemption protects them. *See* 5 U.S.C. § 552(d); United States Department of Defense v. Federal Labor Relations Authority, 510 U.S. 487, 494-495 (1994). Exemption 5 prevents agencies from having to disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5

U.S.C. § 552(b)(5). "This language clearly contemplates that the public is entitled to all such memoranda or letters that a private party could discover in litigation with the agency." E.P.A. v. Mink, 410 U.S. 73, 85-86 (1973). In view of FOIA's policy of broad disclosure, the exemptions are narrowly construed. *See* U.S. Dep't of Justice v. Julian, 486 U.S. 1, 8 (1988). An agency seeking to withhold documents as exempt bears the burden of proving that the documents satisfy the claimed exemption. 5 U.S.C. § 552(a)(4)(B).

Ms. Evans submits a list of twenty three documents that the Park Service has withheld or partially redacted under Exemption 5, based on either attorney-client privilege or deliberative process privilege.[12] The government moves for summary judgment on the basis that its *Vaughn* index meets its burden of showing that all the claimed exemptions are proper. Ms. Evans responds that the *Vaughn* index is inadequate and none of these documents are properly exempt under FOIA.

The first sixteen documents on Ms. Evans's list were withheld on the basis of attorney-client privilege. The attorney-client privilege has long been recognized as within the scope of Exemption 5. *See* N.L.R.B. v. Sears, Roebuck & Co., 421 U.S. 132 (1975). This privilege protects the confidentiality of communications between a client and his or her attorney, and "applies equally to inter-attorney communications or an attorney's notes containing information derived from

---

[12] The list of documents is attached as Exhibit 3 to Ms. Evans's amended complaint. (Doc. No. 29-1, Ex. 3). For convenience, the court will follow the parties' lead and refer to the documents by the numbering system Ms. Evans has assigned them in her list. One of the 24 documents is no longer in dispute, as the government has now provided Ms. Evans with an unredacted version of document #18.

communications to him from a client." <u>Green v. I.R.S.</u>, 556 F.Supp. 79, 85 (N.D. Ind. 1982) *aff'd,* 734 F.2d 18 (7th Cir. 1984). In the FOIA context, attorney-client privilege "unquestionably is applicable to the relationship between Government attorneys and administrative personnel." <u>Id</u>. "A document is subject to the attorney-client privilege if it reflects communications between an agency and an attorney that occurred in the course of providing or obtaining legal advice on the ramifications of an agency's actions." <u>Weigel Broad. Co. v. Fed. Commc'ns Comm'n</u>, No. 11 C 236, 2012 WL 567742, at *2 (N.D. Ill. Feb. 17, 2012) (citing <u>Mead Data Cent., Inc. v. U.S. Dep't of Air Force</u>, 566 F.2d 242, 252 (D.C. Cir. 1977).

With two exceptions, all of the documents in Ms. Evans's list are communications between the Park Service employees and representatives of either the U.S. Attorney's Office or the Office of the Solicitor,[13] and the *Vaughn* index states the ways in which all of these communications concern legal advice and none of them has been released to the public. Contrary to Ms. Evans's arguments, the *Vaughn* index isn't vague or conclusory; it identifies the parties to each conversation and gives as detailed a description of the subject matter as can reasonably be expected given the circumstances. The court rejects Ms. Evans's general attacks on the credibility, accuracy, and level of specificity of the *Vaughn* index, and turns to the objections she raises about specific documents.

---

[13] While Ms. Evans objects to the government referring to the Solicitor as "counsel" for the Park Service, 43 U.S.C. § 1455 provides that the Office of the Solicitor acts as the attorney for the Department of the Interior. The Solicitor is therefore among the Park Service's legal counsel for purposes of the attorney-client privilege.

Ms. Evans first argues that the attorney-client privilege doesn't protect documents #1, #2, and #3 because they were disclosed to an outside party, waiving the privilege. "Generally, a party that voluntarily discloses part of a conversation covered by the attorney-client privilege waives the privilege as to the portion disclosed and to all other communications relating to the same subject matter." Appleton Papers, Inc. v. E.P.A., 702 F.3d 1018, 1024 (7th Cir. 2012) (citing Williams & Connolly v. SEC, 662 F.3d 1240, 1244 (D.C. Cir. 2011)).

These documents are all attachments to a 1973 memo from the Acting Assistant Regional Solicitor to the Superintendent of the Lakeshore about jurisdictional issues – the three attachments are themselves memos or letters between members of the Office of the Solicitor and employees of the Park Service. The three attachments were provided to Ms. Evans with a total of five paragraphs and one sentence between them redacted, and the *Vaughn* index explains that the redacted portions all seek or provide advice on legal questions. Ms. Evans argues that attorney-client privilege has been waived with regard to these documents, because she says the three documents were provided to and discussed with the late U.S. Magistrate Judge Wilbur Glendening. In the early 1970s, Magistrate Judge Glendening had apparently questioned whether the federal government had jurisdiction over crimes committed within the Lakeshore and communicated these concerns to the Park Service.

Even if discussions about a legal position with an officer of the court acting in his official capacity constitute waiver of the attorney-client privilege for FOIA purposes – a proposition that neither party has directly addressed – the court

has no basis on which to conclude that such conversations actually occurred. Ms. Evans cites to a July 13, 1973 letter that she believes shows that "Magistrate Glendening's opinion and the entire topic of jurisdiction were discussed among the Magistrate's office, the [Lakeshore], and the U.S. Attorney's office." The letter, written by a clerk of the district court and addressed to the Superintendent of the Lakeshore, reads in its entirety, "Enclosed is a copy of a letter received from our local Magistrate, Wilbur J. Glendening as referred to in our telephone conversation of this date." (Doc. No. 39-3, pg. 39). As the court reads it, the letter in question says nothing about whether the specific documents at issue were ever shared with Magistrate Judge Glendening; it merely confirms that the Magistrate discussed jurisdictional issues with the Park Service generally. This isn't enough to rebut the government's affirmative statement in the *Vaughn* index (buttressed by the testimony of the government's declarants) that documents #1, #2, and #3 were never shared outside the Park Service and its counsel.

Ms. Evans argues that documents #5 and #19 were "carbon-copied broadly" throughout the Park Service, and that this doesn't show the sort of limited-access treatment necessary to maintain attorney-client privilege. As for document #5, the *Vaughn* index says it was a memorandum from a Park Service Regional Director to a member of the Office of the Solicitor, discussing a list of parks over which the Park Service would like to gain concurrent jurisdiction as well as legal approaches to doing so. This appears to be a textbook example of a privileged communication. The *Vaughn* index says it was never released publicly, and Ms. Evans hasn't provided any authority for the proposition that a document

being communicated to others within an agency destroys the attorney-client privilege.[14] Document #19 is a daily report about jurisdiction and land ownership at the Lakeshore, and the redacted portion of the report is relaying to the Superintendent of the Lakeshore an opinion from an attorney at the Office of the Solicitor about jurisdictional matters. The *Vaughn* index says this report hasn't been publicly released. Again, an attorney's confidential opinion communicated from one member of an agency to another in the course of their duties is protected by attorney-client privilege to the same extent that the initial communication from the attorney to the first member of the agency is.

As to document #11, Ms. Evans suggests that the document represents "working law" of the agency that should be disclosed. She doesn't elaborate on this single-sentence argument, but refers the court to one of her motions to strike for the details. As already discussed with regard to her motions to strike, the court won't allow a party to circumvent the page limits on her opposition brief by wedging into other motions arguments that won't fit in her brief. Regardless, her argument is without merit. Document #11 is a communication from a U.S. Attorney to the Superintendent of the Lakeshore, and the only part of the document redacted is titled "Legal Analysis." This is a privileged communication.

Finally, Ms. Evans argues that the attorney-client privilege doesn't cover documents #12 and #15 because they are purely internal Park Service communications with no attorneys involved. Document #12 is a letter from the

---

[14] Nor has she provided any evidence that the document was actually "carbon-copied broadly" within the agency, as she does not indicate why she thinks this the case and the *Vaughn* index is silent on the point.

Superintendent of the Lakeshore to the Regional Director of the Park Service's Midwest Region requesting a referral to the Office of the Solicitor for legal advice regarding jurisdiction. Document #15 is a letter from the Regional Director to the Superintendent of the Lakeshore, and answers questions about jurisdiction by summarizing four legal opinions on the issue provided by the Office of the Solicitor. The *Vaughn* index states that neither of these documents has ever been publicly disseminated outside the Park Service.

These communications fall within the attorney-client privilege. Both involved discussions within the Park Service, but the redacted portions of the discussions related to the advice of outside counsel. Just as the original legal opinion by the Office of the Solicitor to a Park Service Regional Director was privileged, the Regional Director's relaying of that legal opinion to a subordinate within the Park Service in the course of their duties doesn't destroy the privilege. *See* Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 263 n.24 (D.C. Cir. 1977) ("The fact that the communication at issue in this case may have been circulated among more than one employee of the Air Force does not necessarily destroy their confidentiality."). Were this not so, the privilege would be completely eviscerated in the context of large organizational clients, where the person who directly communicates with a lawyer is rarely the same person responsible for acting on the legal advice.

Documents #17-23 were withheld based on another privilege covered by Exemption 5: the deliberative process privilege. This privilege "rests on the obvious realization that officials will not communicate candidly among

themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001) (internal quotation marks and citations omitted). To qualify for the privilege, a document must be both "predecisional" in the sense that it is "actually [a]ntecedent to the adoption of an agency policy," and deliberative in the sense that it is "actually . . . related to the process by which policies are formulated" rather than simply reciting factual matter. Jordan v. U.S. Dep't of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc), *overruled in part on other grounds by* Crooker v. Bureau of Alcohol, Tobacco, & Firearms, 670 F.2d 1051 (D.C. Cir. 1981) (en banc). Accordingly, the privilege "is narrowly construed, protecting those documents that are predecisional (to avoid chilling discussion), but not exempting documents explaining an agency's final decision." Matter of Wade, 969 F.2d 241, 247 (7th Cir. 1992). The agency seeking to withhold a document "bears the burden of proving what deliberative process was involved and what role the document played in that process." King v. Internal Revenue Service, 684 F.2d 517, 519 (7th Cir. 1982).

The government claims that the *Vaughn* index sets forth sufficient information about the documents to justify the redactions on deliberative process grounds, and the court agrees. The descriptions of documents #17-23 all identify the authors of the documents as Park Service staff, and the documents are intra-agency communications. They all describe the subject

matter of the communications or documents at issue. And they all relate that the documents were authored by those without final decisionmaking authority and before the agency took final action on the relevant topic. Ms. Evans points out that the descriptions of these documents contain conclusory boilerplate language that simply parrots back the standard for claiming the privilege. She is correct that the statements she cites are insufficient to carry the agency's burden of justifying nondisclosure; the *Vaughn* index says of document #17, for example, that the three redacted paragraphs are "pre-decisional and deliberative, were written prior to the agency final decision, and the author was not the final decision-maker." (Def. Ex. 9, at 8). But this boilerplate isn't the only description the index provides. It also describes what the document is (a memorandum addressing responsibilities for water management at the Lakeshore), notes the staff members who authored it, and states the general tenor of the deliberations taking place (a discussion between the Park Service personnel about how to insure the safety of Lakeshore visitors). Had Ms. Evans provided any reason to think that the documents at issue were not predecisional or not deliberative, the government's terse descriptions might not have passed muster. Unrebutted, however, the *Vaughn* index is sufficient to carry the government's burden.

In addition to her general objection that the *Vaughn* index is inadequate to justify withholding these materials as deliberative documents, Ms. Evans makes two specific objections. First, she argues that the redacted portions of document #19 aren't communicating the author's personal opinion, and so are outside the scope of the privilege. She also complains that the government's

*Vaughn* index doesn't include a statement about the foreseeable harm of releasing the document. It's unnecessary to reach these arguments, because the *Vaughn* index also asserts that the attorney-client privilege protects the redacted part of the document, and the court agrees. As discussed above, Document #19 (the report about jurisdiction and land ownership at the Lakeshore) satisfies the requirements for withholding based on attorney-client privilege.

Ms. Evans also challenges document #23 because it ends with language stating: "You may contact the Chief Ranger Dick Littlefield [phone number] for further information or if you have any questions." She argues that this language suggests that document #23 isn't a deliberative document but is instead communicating an already-decided agency action to outside parties. This argument misses the mark because the *Vaughn* index makes clear that this document is a draft memorandum labeled as confidential, which was never finalized, signed, and distributed. The quoted language suggests that the memorandum might have been written with the *intent* to release a final version of it to publicly, but the deliberative process privilege protects an unreleased preliminary draft.

The government's *Vaughn* index and supporting affidavits are enough to carry the government's burden of showing that the withheld material falls under Exemption 5, and the government is entitled to summary judgment on Count III.

*FOIA Exemption 7*

Count IV of Ms. Evans's complaint alleges that the Park Service redacted the majority of the Traffic SOP based on an improper application of FOIA Exemption 7(E). Exemption 7(E) permits an agency to withhold information that would "disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E)). This exemption applies only to techniques and procedures "generally unknown to the public" and only if "(1) the information was compiled for law enforcement purposes, and (2) [its] release could reasonably be expected to risk circumvention of the law." Blanton v. U.S. Dep't of Justice, 63 F.Supp.2d 35, 49 (D.D.C. 1999) (internal quotations omitted).

Ms. Evans argues that the Traffic SOP contains a list of roads over which the Park Service has jurisdiction, and that a list of roads is not a "technique," "procedure," or "guideline" within the meaning of the statute. She insists that releasing this information couldn't possibly result in circumvention of the law, because the public is entitled to know whether federal officers are "overreaching" by patrolling roads over which they don't have jurisdiction. Mr. Bremer's declaration makes clear that the Traffic SOP contains much more than a list of roads, however; it includes guidelines and procedures for officers on such quintessential law enforcement matters as radar-based speed enforcement, issuing citations, and parking enforcement. Because Ms. Evans doesn't mention these topics and directs her arguments only to the list of roads, the court

construes her complaint as challenging only the redaction of "Section IV-A, Jurisdiction on Roadways" of the Traffic SOP.

A memo informing Lakeshore officers which roads they have authority to issue citations on is a "guideline" for FOIA purposes, and there's no question that the material in the Traffic SOP was compiled for law enforcement investigation or prosecution purposes; the list tells officers where they can stop cars and issue tickets. It also appears that this information isn't generally known to the public: Mr. Bremer testified that it has never been released to his knowledge, and the version of the manual available online is redacted. The relevant question, then, is whether its release could reasonably be expected to risk circumvention of the law.

The court agrees with the government that it could. If it became widely known which of the Lakeshore's roads were outside the jurisdiction of park law enforcement, it would be reasonable to expect an increase in traffic offenses on those roads because motorists would know the chances of apprehension and punishment are lower. No law enforcement department can patrol everywhere at once, and so must choose to focus enforcement efforts on some locations over others. A confidential, internal police document memorializing these choices and listing which neighborhoods the department is likely to patrol is a classic example of a law enforcement guideline whose dissemination would be likely to risk circumvention of the law. It might be important that what keeps the officers in our case confined to certain enforcement zones is lack of jurisdiction rather than lack of manpower, but Ms. Evans has supplied no authority for the

proposition that such a distinction matters for purposes of FOIA Exemption 7(E).[15] All that matters for the court's analysis is that disseminating the information in the Traffic SOP is likely to result in an uptick in lawbreaking by citizens who will know where park officers are powerless to enforce traffic rules.

The Park Service's redactions to the Traffic SOP were proper under Exemption 7(E) and the government is entitled to summary judgment on Count IV of Ms. Evans's complaint.

## Failure to Segregate

Count V of Ms. Evans's complaint is very brief, simply reciting that:

> Defendants have not demonstrated that the segregated material qualifies for an exemption nor have Defendants provided sufficient reasons behind its conclusions that more non-exempt material could not be segregated from exempt material. Instead, Plaintiff charges that Defendants' redactions are overbroad.

(Am. Compl., ¶ 115). Ms. Evans doesn't identify for which documents she believes the Park Service has failed to segregate exempt and non-exempt material, and instead appears to be making a general objection that the Park Service was too aggressive in redacting the documents it provided to her. The court interprets this count to be redundant to the counts above alleging improper redaction under Exemptions 5 and 7(E). Because the government's FOIA responses, *Vaughn* index, and supporting declarations show that all the

---

[15] Ms. Evans suggests that "[r]eleasing a list of roads does not risk circumvention of the law, as it does not change whether the behavior is or is not illegal." But because police don't make the laws, that is true of *any* internal police document covered by Exemption 7(E).

redactions the Park Service made[16] fell within one of FOIA's enumerated exemptions, the government is entitled to summary judgment on count V of Ms. Evans's complaint.

*Unreasonable Delay*

Finally, Count VI of Ms. Evans's complaint alleges that the Park Service's delayed response to her FOIA requests was egregious and unreasonable, and that the Park Service is "engaging in an informal practice of withholding records in violation of FOIA deadlines and only releasing such information in response to litigation filings." (Am. Compl., ¶ 117). The government moves for summary judgment based on the argument that late responses to FOIA requests without more don't support a cause of action under the statute.

While the government is correct that nothing in FOIA empowers a district court to award damages based on long delays to FOIA requests, Ms. Evans didn't seek damages; she sought the immediate release of the documents she believed wrongly withheld, and also asked the court to "enjoin Defendants from engaging in future violations of the letter and spirit of FOIA by intentionally delaying the production of documents by ignoring FOIA's deadlines and mandates." (Am. Compl., pg. 24). When a plaintiff has shown that an agency has a "pattern or practice" of violating FOIA's mandate, courts retain the equitable discretion to

---

[16] To be clear, the court addresses only the redactions to documents released in response to requests 12-360, 12-514, and 12-999. As already discussed, Ms. Evans hasn't administratively exhausted her claims regarding requests 12-513, 12-515, and 13-60, so the court hasn't evaluated the validity of the Park Service's redactions as to those requests.

enjoin an agency from further violations. *See* <u>Payne Enterprises, Inc. v. United States</u>, 837 F.2d 486, 491 (D.C. Cir. 1988) ("Courts have long recognized that there may very well be circumstances in which prolonged delay in making information available or unacceptably onerous opportunities for viewing disclosed information require judicial intervention.") (internal quotations omitted). At least one court has approved the idea of an injunction against an agency specifically for failing to timely respond to requests. *See* <u>Long v. U.S. I.R.S.</u>, 693 F.2d 907, 910 (9th Cir. 1982) (directing district court to issue injunction where facts showed IRS had a practice of unreasonably delaying responses to FOIA requests and "has indicated that the delays will recur in the future."). The court has the equitable discretion to enjoin the Park Service from repeating the long delays that characterized Ms. Evans's interactions with the agency.

The court understands Ms. Evans's frustration at the delays she endured in this case; none of the agency's responses to her requests were timely, and they often falling outside the statutory twenty-working-days deadline by several months. Indeed, many of the Park Service's response letters to Ms. Evans acknowledged that the agency was missing statutory deadlines. But no injunction is warranted in this case because there is insufficient evidence to show that what Ms. Evans experienced was a Park Service pattern or practice of unreasonable delay rather than an isolated problem related to her requests specifically. Ms. Evans hasn't shown that requesters other than herself have experienced unreasonable delays, pointed to a formal policy adopted by the Park

Service that violates the terms of the statute, or shown any other evidence that the Park Service's treatment of her request was sufficiently uniform to be considered an unlawful policy or practice. *See* O'Neill v. U.S. Dep't of Justice, No. 05-C-0306, 2008 WL 819013, at *12 (E.D. Wis. Mar. 25, 2008) (holding plaintiff's "pattern or practice" claims unripe, because plaintiff had identified neither a written FOIA policy nor "evidence that the plaintiff submitted substantially identical requests to the ATF for documents and received substantially identical responses which would support the existence of a crystallized policy or practice."). This case is therefore unlike others in which courts have found claims against agencies ripe for pattern and practice injunctive relief. *Compare, e.g.*, Pub. Citizen v. Dep't of State, 276 F.3d 634, 641 (D.C. Cir. 2002) (declaring unreasonable Secretary of State's formal "cut-off" policy for replying to FOIA requests); Payne Enters, Inc. v. United States, 837 F.2d 486 (D.C. Cir. 1988) (holding that agency's informal practice of unjustified delay in responding to repeated requests from one entity for one type of document was sufficiently "crystallized" to be ripe for review).

Accordingly, the government is entitled to summary judgment on Count VI of Ms. Evans's complaint.


IV. Conclusion

For the reasons stated above, the court GRANTS IN PART AND DENIES IN PART Ms. Evans's motions to strike the declarations of Michael Bremer (Doc. No. 42) and Elizabeth McConnell (Doc. No. 43); DENIES Ms. Evans's motions to

strike the declarations of Patricia Rooney (Doc. No. 45), and Dana Jacobsen (Doc. No. 66); DENIES Ms. Evans's motion to strike the *Vaughn* index (Doc. No. 44); and GRANTS the government's motion for summary judgment (Doc. No. 38).

SO ORDERED.

ENTERED:  <u>September 28, 2015</u>

<u>        /s/ Robert L. Miller, Jr.        </u>
Judge
United States District Court